IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Donna Rae Rutherford, | ) | Civil Action No. 8:12-cv-02949-DCN-JDA |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **OF MAGISTRATE JUDGE** |
| Carolyn W. Colvin,[1] | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(a), D.S.C.[2] Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB"). For the reasons set forth below, it is recommended that the decision of the Commissioner be affirmed.

## PROCEDURAL HISTORY

On December 28, 2009, Plaintiff filed an application for DIB, alleging an onset of disability date of January 1, 2002. [R. 103-111. ] The claim was denied initially on March, 26, 2010 [R. 45-46], and on reconsideration on July 14, 2010 [R. 47-48] by the Social Security Administration ("the Administration"). Plaintiff requested a hearing before an

---

[1]Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of § 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]A Report and Recommendation is being filed in this case, in which one or both parties declined to consent to disposition by a magistrate judge.

administrative law judge ("ALJ"), and on February 8, 2011, ALJ Augustus C. Martin conducted a de novo video hearing on Plaintiff's claims, Plaintiff appearing in Myrtle Beach and the ALJ in North Charleston, South Carolina.  [R. 8-23.]

The ALJ issued a decision on February 25, 2011, finding Plaintiff not disabled under the Social Security Act ("the Act").  [R. 11-19.]  At Step 1,[3] the ALJ found Plaintiff last met the insured status requirements of the Act on September 30, 2006 and had not engaged in substantial gainful activity during the period of her alleged onset date of January 1, 2002 through her date last insured of September 30, 2006.  [R. 13, Findings 1 & 2].  At Step 2, the ALJ found Plaintiff had severe impairments of rectal ulcer syndrome, anxiety and degenerative disk disease of the lumbar spine.  [R. 13, Finding 3.] The ALJ also found Plaintiff had non-severe impairments of falling spells, left-side weakness and headaches. [R. 14].   At Step 3, the ALJ determined none of these impairments, singly or in combination, met or medically equaled one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1; the ALJ specifically considered Listing 1.04 with respect to Plaintiff's degenerative disk disease, Listing 5.06 with respect to Plaintiff's solitary rectal ulcer syndrome,  and Listing 12.06 with respect to Plaintiff's anxiety.   [R. 14-15, Finding 4.]

Before addressing Step 4, Plaintiff's ability to perform her past relevant work, the ALJ made the following findings as to Plaintiff's residual functional capacity ("RFC"):

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional

---

[3] The five-step sequential analysis used to evaluate disability claims is discussed in the Applicable Law section, *infra*.

capacity to perform the full range of unskilled sedentary work as defined in 20 C.F.R. 404.1567(a).

[R. 15, Finding 5 (*internal footnotes omitted*).] Based on this RFC, at Step 4, the ALJ found Plaintiff was unable to perform her past relevant work [R. 18, Finding 6]; however, based on her age, education, work experience, and RFC, he determined that there were jobs that existed in significant number in the national economy that Plaintiff could perform [R. 18, Finding 10.] Consequently, the ALJ found Plaintiff was not under a disability as defined in the Social Security Act at any time from January 1, 2002, the alleged onset date, through September 30, 2006.[4] [R. 19, Finding 11.]

Plaintiff requested Appeals Council review of the ALJ's decision, but the Council declined review. [R. 1–5.] Plaintiff filed this action for judicial review on October 11, 2012. [Doc. 1.]

## **THE PARTIES' POSITIONS**

Plaintiff contends the ALJ's decision is not supported by substantial evidence and must be reversed and remanded because the ALJ

1.     failed to give weight to the treating physicians' notes involving the severity of the Plaintiff's condition and failed to give weight to Dr. Richardson's statement that the Plaintiff is "unable to maintain gainful employment" [Doc. 14 at 3–4];

2.     erred in finding that Plaintiff could perform the full range of sedentary work by rejecting Plaintiff's claim that she needed to lie down one to two hours a day due to pain [*id*. at 4, 10];

---

[4]To be entitled to DIB, Plaintiff had to prove that she was disabled on or before her date last insured. 20 C.F.R. §§ 404.315(a) (describing who is entitled to DIB); 404.130 (explaining disability insured status); *see also Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir. 1993).

3

3.    failed to consider new evidence dated February 3, 2011, supporting Plaintiff's limited restrictions [*id*. at 4, 14]; and

4.    improperly gave Plaintiff's testimony regarding her limitations "limited weight" without providing a rationale for "rejecting her testimony" [*id*. at 11–12].

The Commissioner, on the other hand, submits that ALJ's decision is supported by substantial evidence, specifically arguing that the ALJ

1.    properly assessed Plaintiff's RFC and fully explained his reasoning for not fully crediting Plaintiff's testimony [Doc 16 at 10–15];

2.    properly declined to include late-filed evidence which did not relate to the period on or before the date of the ALJ's hearing decision [*id*. at 15–19].

## STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla—i.e., the evidence must do more than merely create a suspicion of the existence of a fact and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citing *Woolridge v. Celebrezze*, 214 F. Supp. 686, 687 (S.D.W. Va. 1963))("Substantial evidence, it has been held, is evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'").

4

Where conflicting evidence "allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)," not on the reviewing court. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991) (stating that where the Commissioner's decision is supported by substantial evidence, the court will affirm, even if the reviewer would have reached a contrary result as finder of fact and even if the reviewer finds that the evidence preponderates against the Commissioner's decision).  Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Commissioner so long as the decision is supported by substantial evidence. *Laws*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 520 (4th Cir. 1962).

The reviewing court will reverse the Commissioner's decision on plenary review, however, if the decision applies incorrect law or fails to provide the court with sufficient reasoning to determine that the Commissioner properly applied the law. *Myers v. Califano,* 611 F.2d 980, 982 (4th Cir. 1980); *see also Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).  Where the Commissioner's decision "is in clear disregard of the overwhelming weight of the evidence, Congress has empowered the courts to modify or reverse the [Commissioner's] decision 'with or without remanding the cause for a rehearing.'"  *Vitek  v. Finch*, 438 F.2d 1157, 1158 (4th Cir. 1971) (quoting 42 U.S.C. § 405(g)).  Remand is unnecessary where "the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and

when reopening the record for more evidence would serve no purpose." *Breeden v. Weinberger*, 493 F.2d 1002, 1012 (4th Cir. 1974).

The court may remand a case to the Commissioner for a rehearing under sentence four or sentence six of 42 U.S.C. § 405(g).  *Sargent v. Sullivan*, 941 F.2d 1207 (4th Cir. 1991) (unpublished table decision).  To remand under sentence four, the reviewing court must find either that the Commissioner's decision is not supported by substantial evidence or that the Commissioner incorrectly applied the law relevant to the disability claim. *See, e.g.*, *Jackson v. Chater*, 99 F.3d 1086, 1090–91 (11th Cir. 1996) (holding remand was appropriate where the ALJ failed to develop a full and fair record of the claimant's residual functional capacity); *Brehem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (holding remand was appropriate where record was insufficient to affirm but was also insufficient for court to find the claimant disabled).   Where the court cannot discern the basis for the Commissioner's decision, a remand under sentence four may be appropriate to allow the Commissioner to explain the basis for the decision.  *See Smith v. Heckler*, 782 F.2d 1176, 1181–82 (4th Cir. 1986) (remanding case where decision of ALJ contained "a gap in its reasoning" because ALJ did not say he was discounting testimony or why); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984) (remanding case where neither the ALJ nor the Appeals Council indicated the weight given to relevant evidence).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *See Smith*, 782 F.2d at 1182 ("The [Commissioner] and the claimant may produce further evidence on remand.").  After a remand under sentence four, the court

enters a final and immediately appealable judgment and then loses jurisdiction. *Sargent*, 941 F.2d 1207 (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 102 (1991)).

In contrast, sentence six provides:

> The court may . . . at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding . . . .

42 U.S.C. § 405(g). A reviewing court may remand a case to the Commissioner on the basis of new evidence only if four prerequisites are met: (1) the evidence is relevant to the determination of disability at the time the application was first filed; (2) the evidence is material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before him; (3) there is good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner; and (4) the claimant made at least a general showing of the nature of the new evidence to the reviewing court. *Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (citing 42 U.S.C. § 405(g); *Mitchell v. Schweiker*, 699 F.2d 185, 188 (4th Cir. 1983); *Sims v. Harris*, 631 F.2d 26, 28 (4th Cir. 1980); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)), *superseded by amendment to statute*, 42 U.S.C. § 405(g), *as recognized in Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 925 F.2d 769, 774 (4th Cir. 1991).[5] With remand under sentence

---

[5] Though the court in *Wilkins* indicated in a parenthetical that the four-part test set forth in *Borders* had been superseded by an amendment to 42 U.S.C. § 405(g), courts in the Fourth Circuit have continued to cite the requirements outlined in *Borders* when evaluating a claim for remand based on new evidence. *See, e.g.*, *Brooks v. Astrue*, No. 6:10-cv-152, 2010 WL 5478648, at *8 (D.S.C. Nov. 23, 2010); *Ashton v. Astrue*, No. TMD 09-1107, 2010 WL 3199345, at *3 (D. Md. Aug. 12, 2010); *Washington v. Comm'r of Soc. Sec.*, No. 2:08-cv-93, 2009 WL 86737, at *5 (E.D. Va. Jan. 13, 2009); *Brock v. Sec'y of Health & Human Servs.*, 807 F. Supp. 1248, 1250 n.3 (S.D.W. Va. 1992). Further, the Supreme Court of the United States has not suggested *Borders*' construction of § 405(g) is incorrect. *See Sullivan v. Finkelstein*, 496 U.S. 617, 626 n.6 (1990). Accordingly, the Court will apply the more stringent *Borders* inquiry.

7

six, the parties must return to the court after remand to file modified findings of fact. *Melkonyan*, 501 U.S. at 98. The reviewing court retains jurisdiction pending remand and does not enter a final judgment until after the completion of remand proceedings. *See Allen v. Chater*, 67 F.3d 293 (4th Cir. 1995) (unpublished table decision) (holding that an order remanding a claim for Social Security benefits pursuant to sentence six of 42 U.S.C. § 405(g) is not a final order).

## APPLICABLE LAW

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a disability. 42 U.S.C. § 423(a). "Disability" is defined as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 consecutive months.

*Id.* § 423(d)(1)(A).

## I.    The Five Step Evaluation

To facilitate uniform and efficient processing of disability claims, federal regulations have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g.*, *Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (noting a "need for efficiency" in considering disability claims). The ALJ must consider whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a severe impairment; (3) the impairment meets or equals an impairment included in the Administration's Official Listings of Impairments found at 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) the impairment prevents

the claimant from performing past relevant work; and (5) the impairment prevents the claimant from having substantial gainful employment. 20 C.F.R. § 404.1520. Through the fourth step, the burden of production and proof is on the claimant. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983). The claimant must prove disability on or before the last day of her insured status to receive disability benefits. *Everett v. Sec'y of Health, Educ. & Welfare*, 412 F.2d 842, 843 (4th Cir. 1969). If the inquiry reaches step five, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform, considering the claimant's age, education, and work experience. *Grant*, 699 F.2d at 191. If at any step of the evaluation the ALJ can find an individual is disabled or not disabled, further inquiry is unnecessary. 20 C.F.R. § 404.1520(a); *Hall v. Harris*, 658 F.2d 260, 264 (4th Cir. 1981).

### A.    *Substantial Gainful Activity*

"Substantial gainful activity" must be both substantial—involves doing significant physical or mental activities, 20 C.F.R. § 404.1572(a)—and gainful—done for pay or profit, whether or not a profit is realized, *id.* § 404.1572(b). If an individual has earnings from employment or self-employment above a specific level set out in the regulations, he is generally presumed to be able to engage in substantial gainful activity. *Id.* §§ 404.1574–.1575.

### B.    *Severe Impairment*

An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. *See id.* § 404.1521. When determining whether a claimant's physical

9

and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments.  42 U.S.C. § 423(d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person and not in the abstract, having several hypothetical and isolated illnesses.  *Walker v. Bowen*, 889 F.2d 47, 49–50 (4th Cir. 1989) (stating that, when evaluating the effect of a number of impairments on a disability claimant, "the [Commissioner] must consider the combined effect of a claimant's impairments and not fragmentize them").  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *Id.* at 50 ("As a corollary to this rule, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments.").  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process."  42 U.S.C. § 423(d)(2)(B).

### C.    *Meets or Equals an Impairment Listed in the Listings of Impairments*

If a claimant's impairment or combination of impairments meets or medically equals the criteria of a listing found at 20 C.F.R. Pt. 404, Subpt. P, App.1 and meets the duration requirement found at 20 C.F.R. § 404.1509, the ALJ will find the claimant disabled without considering the claimant's age, education, and work experience.  20 C.F.R. § 404.1520(d).

### D.    *Past Relevant Work*

The assessment of a claimant's ability to perform past relevant work "reflect[s] the statute's focus on the functional capacity retained by the claimant."  *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995).  At this step of the evaluation, the ALJ compares the

10

claimant's RFC[6] with the physical and mental demands of the kind of work he has done in the past to determine whether the claimant has the RFC to do her past work.  20 C.F.R. § 404.1560(b).

### E.    *Other Work*

As previously stated, once the ALJ finds that a claimant cannot return to her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy.  *See Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992); 20 C.F.R. § 404.1520(f)–(g).    To meet this burden, the Commissioner may sometimes rely exclusively on the Medical-Vocational Guidelines (the "grids").    Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant nonexertional factors.[7]    20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(e); *see also Gory v. Schweiker*, 712 F.2d 929, 930–31 (4th Cir. 1983) (stating that exclusive reliance on the grids is appropriate in cases involving exertional limitations).    When a claimant suffers from both exertional and nonexertional limitations, the grids may serve only as guidelines.  *Gory*, 712 F.2d at 931. In such a case, the Commissioner must use a vocational expert to establish the claimant's ability to perform other work.  20 C.F.R. § 404.1569a; *see Walker*, 889 F.2d at 49–50

---

[6] RFC is "the most [a claimant] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a).

[7] An exertional limitation is one that affects the claimant's ability to meet the strength requirements of jobs. 20 C.F.R. § 404.1569a(a).  A nonexertional limitation is one that affects the ability to meet the demands of the job other than the strength demands.  *Id.*  Examples of nonexertional limitations include but are not limited to difficulty functioning because of being nervous, anxious, or depressed; difficulty maintaining attention or concentrating; difficulty understanding or remembering detailed instructions; difficulty seeing or hearing. § 404.1569a(c)(1).

11

("Because we have found that the grids cannot be relied upon to show conclusively that claimant is not disabled, when the case is remanded it will be incumbent upon the [Commissioner] to prove by expert vocational testimony that despite the combination of exertional and nonexertional impairments, the claimant retains the ability to perform specific jobs which exist in the national economy.").  The purpose of using a vocational expert is "to assist the ALJ in determining whether there is work available in the national economy which this particular claimant can perform."  *Walker*, 889 F.2d at 50.  For the vocational expert's testimony to be relevant, "it must be based upon a consideration of all other evidence in the record, . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Id.* (citations omitted).

## II.     Developing the Record

The ALJ has a duty to fully and fairly develop the record.  *See Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986).  The ALJ is required to inquire fully into each relevant issue.  *Snyder*, 307 F.2d at 520.  The performance of this duty is particularly important when a claimant appears without counsel.  *Marsh v. Harris*, 632 F.2d 296, 299 (4th Cir. 1980).  In such circumstances, "the ALJ should scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts, . . . being especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited."  *Id.* (internal quotations and citations omitted).

## III.    Treating Physicians

If a treating physician's opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527(c)(2); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001).  The ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, i.e., when the treating physician's opinion does not warrant controlling weight, *Craig*, 76 F.3d at 590, but the ALJ must nevertheless assign a weight to the medical opinion based on the 1) length of the treatment relationship and the frequency of examination; 2) nature and extent of the treatment relationship; 3) supportability of the opinion; 4) consistency of the opinion with the record a whole; 5) specialization of the physician; and 6) other factors which tend to support or contradict the opinion, 20 C.F.R. § 404.1527©.  Similarly, where a treating physician has merely made conclusory statements, the ALJ may afford the opinion such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Craig*, 76 F.3d at 590 (holding there was sufficient evidence for the ALJ to reject the treating physician's conclusory opinion where the record contained contradictory evidence).

In any instance, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983) (stating that treating physician's opinion must be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition for a prolonged period of time"); 20 C.F.R. § 404.1527(c)(2).  An ALJ determination coming

down on the side of a non-examining, non-treating physician's opinion can stand only if the medical testimony of examining and treating physicians goes both ways. *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986). Further, the ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. 20 C.F.R. § 404.1527(d). However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability. *Id.*

## IV.    Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 404.1517; *see also Conley v. Bowen*, 781 F.2d 143, 146 (8th Cir. 1986). The regulations are clear: a consultative examination is not required when there is sufficient medical evidence to make a determination on a claimant's disability. 20 C.F.R. § 404.1517. Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. *Id.*

## V.    Pain

Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment that could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423(d)(5)(A). In evaluating claims of disabling

pain, the ALJ must proceed in a two-part analysis. *Morgan v. Barnhart,* 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished opinion). First, "the ALJ must determine whether the claimant has produced medical evidence of a 'medically determinable impairment which could reasonably be expected to produce . . . the actual pain, in the amount and degree, alleged by the claimant.'" *Id.* (quoting *Craig*, 76 F.3d at 594). Second, "if, and only if, the ALJ finds that the claimant has produced such evidence, the ALJ must then determine, as a matter of fact, whether the claimant's underlying impairment *actually* causes her alleged pain." *Id.* (emphasis in original) (citing *Craig*, 76 F.3d at 595).

Under the "pain rule" applicable within the United States Court of Appeals for the Fourth Circuit, it is well established that "subjective complaints of pain and physical discomfort could give rise to a finding of total disability, even when those complaints [a]re not supported fully by objective observable signs." *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) (citing *Hicks v. Heckler*, 756 F.2d 1022, 1023 (4th Cir. 1985)). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. Indeed, the Fourth Circuit has rejected a rule which would require the claimant to demonstrate objective evidence of the pain itself, *Jenkins v. Sullivan*, 906 F.2d 107, 108 (4th Cir. 1990), and ordered the Commissioner to promulgate and distribute to all administrative law judges within the circuit a policy stating Fourth Circuit law on the subject of pain as a disabling condition, *Hyatt v.*

*Sullivan*, 899 F.2d 329, 336–37 (4th Cir. 1990). The Commissioner thereafter issued the

following "Policy Interpretation Ruling":

> This Ruling supersedes, only in states within the Fourth Circuit (North Carolina, South Carolina, Maryland, Virginia and West Virginia), Social Security Ruling (SSR) 88-13, Titles II and XVI: Evaluation of Pain and Other Symptoms:
>
> ...
>
> **FOURTH CIRCUIT STANDARD:** Once an underlying physical or [m]ental impairment that could reasonably be expected to cause pain is shown by medically acceptable objective evidence, such as clinical or laboratory diagnostic techniques, the adjudicator must evaluate the disabling effects of a disability claimant's pain, even though its intensity or severity is shown only by subjective evidence. If an underlying impairment capable of causing pain is shown, subjective evidence of the pain, its intensity or degree can, by itself, support a finding of disability. Objective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available, should be obtained and considered. Because pain is not readily susceptible of objective proof, however, the absence of objective medical evidence of the intensity, severity, degree or functional effect of pain is not determinative.

SSR 90-1p, 55 Fed. Reg. 31,898-02, at 31,899 (Aug. 6, 1990). SSR 90-1p has since been

superseded by SSR 96-7p, which is consistent with SSR 90-1p. *See* SSR 96-7p, 61 Fed.

Reg. 34,483-01 (July 2, 1996). SSR 96-7p provides, "If an individual's statements about

pain or other symptoms are not substantiated by the objective medical evidence, the

adjudicator must consider all of the evidence in the case record, including any statements

by the individual and other persons concerning the individual's symptoms." *Id.* at 34,485;

*see also* 20 C.F.R. § 404.1529(c)(1)–(c)(2) (outlining evaluation of pain).

16

## VI.    Credibility

The ALJ must make a credibility determination based upon all the evidence in the record.  Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Although credibility determinations are generally left to the ALJ's discretion, such determinations should not be sustained if they are based on improper criteria.  *Breeden*, 493 F.2d at 1010 ("We recognize that the administrative law judge has the unique advantage of having heard the testimony firsthand, and ordinarily we may not disturb credibility findings that are based on a witness's demeanor.  But administrative findings based on oral testimony are not sacrosanct, and if it appears that credibility determinations are based on improper or irrational criteria they cannot be sustained.").

## APPLICATION AND ANALYSIS

**Brief Medical History**

***Pre-September 30, 2006*** *(date last insured)*

Plaintiff was seen at the Woman's Medical Clinic ("WMC") on January 25, 2002 for the examination of a second-degree perineal tear she sustained during childbirth a week prior.  [R. 264.]  On February 20, 2002, Plaintiff was seen for a postpartum exam.  [R. 262.]  On March 7, 2002, Plaintiff was seen at WMC complaining of being unable to cope "all the things on her plate;" her ex-husband was fighting for custody of her 11-year old daughter, she has just had a baby six weeks earlier, and she was having financial difficulties with her business.  [R. 261.]  On March 27, 2002, Plaintiff was seen to discuss

17

her postpartum depression and showed significant improvement after being put on Celexa. [R. 261.]

On September 19, 2002 Plaintiff was seen at WMC for her annual exam. At that time, she complained of problems with anxiety and depression due to some business problems, and a two-week history of dizziness. [R. 260.] Plaintiff was assessed with mild vertigo and situational depression, but was otherwise stable on exam. [R. 260.] Plaintiff presented again at the WMC on September 24, 2003, for her annual exam, and gave complaints of hot flashes, poor sleep, and chest pain occurring several times a week, radiating down her left arm and causing some actual weakness in the arm. [R. 259.]

On April 14, 2004, Plaintiff was seen by gastroenterologist Dr. Richard Eisenman ("Dr. Eisenman"), on referral from Dr. Paul Richardson ("Dr. Richardson"), for an evaluation of rectal bleeding and painful hemorrhoids. [R. 225.] Plaintiff complained of having difficulty with her stomach, which she believed were caused by having been through a divorce and bankruptcy. [*Id*.] On physical exam, Dr. Eisenman noted no external hemorrhoids or anal fissures. [R. 226.] Dr. Eisenman recommended Plaintiff have a visualization of her distal colon by flexible sigmoidoscopy or colonoscopy. [R. 227.]

A colonoscopy was performed on April 20, 2004, and on May 5, 2004, Plaintiff returned to Dr. Eisenman for the results. [R. 228, 240–44.] Dr. Eisenman indicated the colonoscopy was unremarkable, except within the mid-rectum where there was a circumferential area of erythema and ulceration. [*Id*.] Biopsies taken were unremarkable; however, within the rectum were fibrosis of the lamina propria, as well as ulcers suggestive

18

of solitary rectal ulcer syndrome[8].   Id.   Dr. Eisenman did not believe Plaintiff had inflammatory bowel disease. [*Id*.]  Plaintiff was referred to Dr. Christopher Lahr ("Dr. Lahr") in Charleston for further evaluation.  [R. 229.]  Dr. Lahr confirmed the presence of solitary rectal ulcer and also diagnosed her with rectal prolapse. [*Id*.]   The initial plan was for Plaintiff to have surgery; however, Plaintiff never underwent the procedure. [*Id*.]

On October 18, 2004, Plaintiff was seen at the WMC with complaints of back pain, pain in the right side, urinary frequency and dysuria.  [R. 257.]  She was seen again on October 29, 2004, with complaints of extremely heavy and painful periods, loss of urine when coughing, sneezing or jumping, and problems with constipation. [R. 256.]  A urinary tract infection was suspected. [*Id*.]  On November 30, 2004, Plaintiff had surgery in which a total vaginal hysterectomy, left salpingo oophorectom and posterior repair were performed by Dr. Terry Levenson at Conway Medical Center. [R. 266.]

In April 2005, Plaintiff was seen for complaints of stomach cramps which became worse with stress, occasional constipation, nausea and bloating. [R. 252.] In June 2006, she was seen as WMC for "IBS, rectal prolapse."  [R. 250.] Lab notes from Plaintiff's June 2006 through August 2007 visits to WMC generally show normal findings on physical exam. [R. 247–250.]

---

[8]Solitary rectal ulcer syndrome is a condition that occurs when a sore (ulcer) develops in the rectum. The rectum is a muscular tube that's connected to the end of your colon. Stool passes through the rectum on its way out of the body.  Solitary rectal ulcer syndrome is a rare and poorly understood disorder that occurs in people with chronic constipation. Solitary rectal ulcer syndrome can cause rectal bleeding and straining during bowel movements.  Despite its name, sometimes more than one rectal ulcer occurs in solitary rectal ulcer syndrome.  Treatments for solitary rectal ulcer syndrome range from changing your diet and fluid intake to surgery. http://www.mayoclinic.org/diseases-conditions/rectal-ulcer/basics/definition/con-20027352, "*Solitary rectal ulcer syndrome*", last visited January 27, 2014.

Progress notes from Carolina Rheumatology and Neurology ("CR&N") show that in September 2003, Plaintiff presented with chest pain, anxiety/depression and reported gestational diabetes. [R. 375.] Her chest pain was determined to be most likely related to her anxiety/depression, but Dr. Richardson indicated he could not rule out coronary heart disease, although highly unlikely. [R. 376.] Dr. Richardson ordered a stress Cardiolite [R. 376], however, Plaintiff cancelled the test because she was felling better [R. 374]. Plaintiff was seen again in November 2003 on follow up for her anxiety/depression and reported chest pain. [R. 374.] Treatment notes indicate that labs performed after her September visit were all excellent and that Plaintiff's anxiety/depression was likely the etiology of most of her problems. [*Id.*]

Plaintiff was seen again at CR&N in March 2004 on follow up of anxiety/depression and new complaints of abdominal symptoms, including intermittent. [R. 373.] Dr. Richardson's impression was probable IBS, severe hemorrhoids, anxiety/depression (improved on Paxil), chest discomfort (which has not recurred, likely related to anxiety) and Metromenorrhagia. [*Id.*] Carol Ann Gardner, CFNP, under the supervision of Dr. Richardson, noted Plaintiff had situational anxiety/depression and that her MMP[9] was stable. [R. 369.]

In July 2005, Plaintiff was seen at CR&N for complaints of dizziness, and bilateral ear discomfort; she was diagnosed with vertigo, and acute sinus dysfunction. [R. 368.] In May 2006, Plaintiff presented with bilateral leg pain and back pain; and MRI of the LS

---

[9] Mucous Membrane Pemphigoid ("MMP"), also known as cicatricial pemphigoid, is an autoimmune reaction which most commonly affects the mouth, causing lesions in the gingiva or gums, but it can also affect areas of mucous membrane elsewhere in the body, such as the sinuses, genitals and anus. When the cornea of the eye is affected, repeated scarring may result in blindness. http://en.wikipedia.org/wiki/Cicatricial_pemphigoid, last visited January 30, 2014.

spine was ordered.  [R. 367.]  Progress notes from July 2006 indicate Plaintiff's medication was working well for her IBS and that her exam was within normal limits.  [R. 364.]

### *Post-September 30, 2006* (*date last insured*)

Plaintiff returned to CR&N on October 12, 2006, following a hospitalization for chest pain.  She complained of continued fatigue, feelings that her heart is beating fast, and left arm tingling at intervals.  [R. 363.]  On October 25, 2006, Plaintiff was seen at Pee Dee Cardiology Associates by Dr. Amit Pande for complaints of heart palpitations, shortness of breath and occasional leg pain.  [R. 190.]    Subsequent testing revealed a normal cardiovascular system, no gallops or murmurs, good air entry, clear to auscultation, and no mitral valve prolapse.  [R. 191.]  Plaintiff had previously undergone a stress Cardiolite at Conway Hospital on October 6, 2006, when she presented with the same complaints. [R. 190.] Treatment notes from November 1, 2006, show the 48-Holter monitor recordings were essentially normal. [R. 193.]   On October 26, 2006, Plaintiff returned to CR&N with concerns in reference to her memory and thought process changes. [R. 362.] She complained that her memory was getting worse and she forgets easily and is unable to keep her mind focused on things. [*Id*.]  Dr. Richardson and Carol Ann Gardner though the complaints were due to anxiety and stress but ordered and MRI of the brain to rule out any physiological problems. [*Id*.]

Treatment notes from December 19, 2006, indicate Plaintiff was referred to the Neurosurgery Clinic a Medical University of South Carolina ("MUSC") for treatment of a Chiari malformation.  [R. 215.]  Dr. Bruce Frankel of the Neurosurgery Clinic indicates in

his notes that Plaintiff had a recent onset of suboccipital headaches[10] radiating to the vertex of her head with Valsalva augmentation. [*Id*.] Additionally, Plaintiff complained of facial numbness and occasional numbness and tingling in her hands. [*Id*.] On physical exam, Plaintiff was noted to be alert and fully oriented with clear speech and coherent thoughts. [*Id*.]

Subsequent treatment notes from MUSC dated April 17, 2007 show that Plaintiff was again seen for suboccipital headaches radiating to the vertex of the head, left facial numbness and intermittent tingling in the hands. [R. 204.] Plaintiff's physical exam resulted in findings within normal limits except that Plaintiff was noted to be anxious and found to have abnormal gag reflex. Id. Notes indicate Plaintiff was scheduled for "MR tonight 4/17; surgery 4/18". [R. 205, 213.] A Chiari decompression was performed on Plaintiff on April 18, 2007, by Dr. Frankel. [R. 220–22.] On April 21, 2007, Plaintiff was determined to be stable and discharged to her home. [R. 220.]

On May 8, 2007, Plaintiff was seen for a postoperative visit after her Chiari decompression. Treatment notes indicate Plaintiff presented in a wheelchair and complained of being weak and falling at home. [R. 212.] On physical exam, Plaintiff appeared to have a stiff neck requiring her to turn her entire body, good strength in the upper extremities and no focal deficits. Id. Plaintiff was prescribed Lortab, given a muscle relaxant, was advised to increase her fluid intake and encouraged to ambulate. Id. On

---

[10]Suboccipital headache is a condition characterized by a deep dull constant throbbing at the base of the skull. The treatment involves physical therapy modalities, therapeutic muscle stretching and neuromuscular re-education. Add to the above a regimen of doctor-assisted stretching and self home exercises designed to build strength and improve body posture. http://www.dukechironyc.com/suboccipital_headache.html, last visited January 26, 2014.

May 29, 2007, Plaintiff returned for a follow up after her surgery. [R. 211.] Treatment notes indicate that Plaintiff's symptoms preoperative and immediately postoperative are improving and that, neurologically, she continues to improve. [*Id*.] Plaintiff was seen on June 8, 2007 at CR&N and Carol Ann Gardner noted that Plaintiff appeared "100% improved from her last visit. . .. She was recently seen at MUSC by a neurologist and given a very good report." [R. 359.]

Plaintiff was seen on September 11, 2007, at CR&N on follow up on the Chiari-I malformation surgery with complaints of continued headaches and short-term memory changes. [R. 358.] On September 25, 2007, Plaintiff returned to the Neurosurgery clinic experiencing anxiety, depression and forgetfulness, which Dr. Bruce Frankel ("Dr. Frankel") attributed to the Chiari. [R. 210.] Treatment notes indicate that Plaintiff's headaches are now in the front of the head as opposed to the back. [*Id*.] Dr. Frankel also indicated that, due to her life situation getting out of hand, Plaintiff could use some psychiatric assistance as well as the Cymbalta. [*Id*.]

In October 2007, Plaintiff was seen at CR&N after a "recent episode of stress, anxiety and headache." [R. 357.] Plaintiff was subsequently seen on November 27, 2007, by Dr. Frankel and found to be neurologically stable. [R. 209.] Treatment notes indicate "MRI demonstrates good decompression of the Chiari malformation. There is good spinal fluid around the medulla and chord. She is on Celexa and doing extremely well on this." Id. The MRI from November 27, 2007 was compared to a previous MRI from April 2007 showing "postsurgical changes to the craniocervical junction consistent with suboccipital craniectomy and resultant dilation of the CSF spaces and formation of the pseudomeningocele." [R. 216.] The notes also indicate that "intervertebral disc and facet

joints are unremarkable; spinal cord is of normal diameter; and the neuroforamina are not narrowed." [*Id*.]  The impression noted was that "post-surgical changes consistent with Chiari decompression.  No evidence of tonsillar herniation or hydrocephalus." [*Id*.]

On February 12, 2008, Plaintiff returned to CR&N on followup with continued complaints of fatigue and bilateral joint pain and discomfort.  [R. 354.]  Carol Ann Gardner referred Plaintiff to a rheumatologist. [*Id*.]  Again in March and April 2008 Plaintiff returned to CR&N with complaints of fatigue; she was given B-12 injections and determined to be stable. [R. 353–354.] In June through December of 2009, Plaintiff continued to complain of headaches on each of her follow-up visits; due to finances, she indicated in December 2009 that she was unable to return to the neurologist at MUSC and Carol Ann Gardner suggested she seek disability.  [R. 345–349.]

In December 2009, Plaintiff returned to Dr. Eisenman on follow up complaining of pain in the right abdomen.  [R. 236.]  Dr. Eisenman noted a "[h]istory of IBS currently with alternating bowel habits, postprandial bloating, and abdominal craming;" abnormal CT scan of the liver suggestive of atypical hemangioma or atypical fibronodular hyperplasia, a history of Chiari 1 malformation status post surgery in 2007, and anxiety.   [R. 237.]

Plaintiff was seen on December 11, 2009, at CR&N with complaints of exhaustion, continued migraines and memory disturbance, and panic attacks.  [R. 300.]  On January 14, 2010, Plaintiff presented to CR&N with complaints of FMS manifested by exhaustion, continued migraines, memory disturbance, panic attacks, insomnia, depression, anxiety, diarrhea and alternating constipation, and diffuse pains including shoulders, leg and neck. [R. 299.]   On January 25, 2010, Plaintiff continued to complain of chronic migraines, chronic insomnia, chronic fatigue, fibromyalgia, recurrent hematuria/urinary dysfunction,

anxiety/depression and MMP; Carol Ann Gardner again discussed with Plaintiff the possibility of seeking disability due to limited ability to maintain gainful employment. [R. 344.] Plaintiff was also treated at Coastal Orthopaedics from April 2009 to February 2010 for problems with left shoulder pain and a crush injury to her right thumb. [R. 378-389.]

A medical source statement from Carolina Internal Medicine dated February 16, 2010, indicates that Plaintiff was last treated on January 25, 2010, had severe anxiety and mild depression, was oriented as to time, person, place, situation, had slowed yet appropriate thought process and thought content but was worried, anxious and depressed. [R. 391.] The statement also indicates that Plaintiff exhibits obvious work-related limitations due to chronic pain, as well as depression and anxiety issues. [*Id.*] Plaintiff also presented treatment records from April 2010 through December 2010 from Dr. Richard Stice regarding treatment for Plaintiff's mental impairments.   [R.437–39.]

**Weight Assigned to the Treating Physician Opinions**

Plaintiff argues the ALJ erred by not giving Plaintiff's treating physicians' opinion controlling weight, and that the ALJ improperly opined that "exams with Dr. Eisenman and Dr. Richardson were unremarkable" although treatment notes indicate Plaintiff's impairments had more than a minimal effect on her ability to perform work related activities. [Doc. 14 at 3.]   Plaintiff also asserts the ALJ failed to give weight to Dr. Richardson's statement that Plaintiff is "unable to maintain gainful employment."   [*Id*. at 4.]

*Analysis*

The ALJ is obligated to evaluate and weigh medical opinions "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). Courts typically "accord 'greater weight to the testimony of a treating physician' because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* (quoting *Mastro*, 270 F.3d at 178). While the ALJ may discount a treating physician's opinion if it is unsupported or inconsistent with other evidence, *Craig*, 76 F.3d at 590, the ALJ must still weigh the medical opinion based on the factors listed in 20 C.F.R. § 404.1527(c).

The opinion of a treating physician is given controlling weight only if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Additionally, Social Security Ruling ("SSR") 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion:

> [A] finding that a treating source medical opinion is not well supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527 and 416.927. In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

26

1996 WL 374188, at *4 (July 2, 1996).  However, not every opinion offered by a treating

source is entitled to deference:

> Medical sources often offer opinions about whether an individual who has applied for title II or title XVI disability benefits is "disabled" or "unable to work," or make similar statements of opinions.  In addition, they sometimes offer opinions in other work-related terms; for example, about an individual's ability to do past relevant work or any other type of work.  Because these are administrative findings that may determine whether an individual is disabled, they are reserved to the Commissioner.  Such opinions on these issues must not be disregarded.  However, even when offered by a treating source, they can never be entitled to controlling weight or given special significance.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see also* 20 C.F.R. § 404.1527(e)

(stating an ALJ does not have to "give any special significance to the source of an opinion

on issues reserved to the Commissioner," such as an opinion that the claimant is disabled,

the claimant's impairment or impairments meets or equals a listing, or the claimant has a

certain residual functional capacity).

Further, although medical opinions from after the date last insured may sometimes

be probative to a disability determination, these medical opinions must relate back to the

relevant period and offer a retrospective opinion on the past extent of an impairment. *See*

*Wooldridge v. Bowen*, 816 F.2d 157, 160 (4th Cir. 1987).  "[R]etrospective consideration

of evidence is appropriate when 'the record is not so persuasive as to rule out any linkage'

of the final condition of the claimant with his earlier symptoms."  *Bird v. Comm'r of Soc.*

*Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012) (quoting *Moore v. Finch*, 418 F.2d 1224,

1226 (4th Cir. 1969)).  However, such opinions may be discounted when they are dated

long after the date last insured and are inconsistent with other opinions from the relevant period. *Johnson*, 434 F.3d at 656.

### Discussion

At Step 2 of the sequential process, the ALJ found that prior to her date last insured, the Plaintiff's physical exams with Dr Eisenman and Richardson were unremarkable and, thus, her impairments of falling spells, left-sided weakness, and headaches were non-severe, having no more than a minimal effect on her ability to perform work related activities. [R. 14.] Plaintiff takes issue with the ALJ's determination, but provides no argument or reference to any evidence of record by which the Court could find that the ALJ's determination was not supported by substantial evidence. *See, Pass v. Chater,* 65 F.3d 1200, 1203 (4th Cir.1995)(*citing Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir.1992))("The applicant bears the burden of proof during the first four steps of the inquiry, while the burden shifts to the Commissioner for the final step.")  Additionally, even if the ALJ erred in finding these impairments non-severe, he included these impairments in his evaluation of Plaintiff's RFC [*see* R. 16].  Moreover,  an erroneous finding that a Plaintiff's impairment is not severe at Step 2 is harmless if the ALJ finds another severe impairment to proceed beyond Step 2 in the sequential process and considers the limitations imposed by the impairment in his RFC assessment.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir.2007) (finding that the ALJ's failure to label an impairment as severe at step two was harmless when the ALJ discussed its limitations at step four); *see also Groberg v. Astrue,* No. 09–4203, 2011 WL 538870, at *2 (10th Cir. Feb.17, 2011) ("An error at step two concerning the severity of a particular impairment is usually harmless when the ALJ ...

finds another impairment is severe and proceeds to the remaining steps of the evaluation.").

With respect to Plaintiff's allegation that the ALJ improperly rejected "Dr. Richardson's statement that Plaintiff is 'unable to maintain gainful employment,'" the Court, upon review, notes that the record actually shows on January 25, 2010, nurse practitioner Carol Ann Gardner discussed with Plaintiff the possibility of seeking disability due to her limited ability to maintain gainful employment based on her continued complaints of chronic migraines, chronic insomnia, chronic fatigue, fibromyalgia, recurrent hematuria/urinary dysfunction, anxiety/depression and MMP.   [R. 344.] Plaintiff, however, provides no discussion as to how this opinion relates back to the relevant time period, prior to Plaintiff's date last insured.  *See, Bishop v. Astrue*, 2012 WL 961775 at * 4 (D.S.C. Mar. 20, 2012) (finding that new evidence was not material where physician's opinion did not address whether or not Plaintiff was disabled during the relevant time period); *see also Johnson v. Barnhart*, 434 F.3d 650, 655–656 (4th Cir.2005)(holding that the opinion of a treating physician rendered nine months after the claimant's date last insured was irrelevant). Further, the conclusory statement that Plaintiff is "unable to maintain gainful employment" is not a basis for remand, as that is not a decision to be made by a medical provider. *See Castellano v. Secretary of Health & Human Servs*., 26 F.3d 1027, 1029 (10th Cir.1994)(physician opinion that a claimant is totally disabled "is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the [Commissioner]"); 20 C.F.R. § 404.1527(e) ("a statement that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled").  Accordingly, the

Court finds the ALJ's review and consideration of the medical evidence of record during the relevant time period is supported by substantial evidence.

**RFC Determination and Credibility**

Plaintiff argues that the ALJ erred in finding Plaintiff could perform the full range of sedentary work based on the testimony of vocational expert ("VE") Dr. Schmidt.[11]  [Doc. 14 at 4.]  Plaintiff also contends the ALJ erred in failing to give substantial weight to Plaintiff's testimony regarding the "residual functional capacity she experienced as a result of her impairments." [*Id*. at 11.]  Specifically, Plaintiff complains the ALJ did not give a rationale for rejecting her testimony that her rectal prolapse caused her to lie down one to two hours a day, three to four times a week. [*Id*.]  Plaintiff also contends the ALJ failed to recognize the seriousness of her anxiety and depression as well as her brain surgery.  [*Id*. at 12.]

### *RFC and Credibility Determination*

The Administration has provided a definition of RFC and explained what an RFC assessment accomplishes:

> RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his

---

[11] The ALJ is not required to include limitations or restrictions in his hypothetical questions that he found were not supported by the record.  *Lee v. Sullivan*, 945 F.2d 687, 692 (4th Cir.1991) (a requirement introduced by claimant's counsel in a question to the vocational expert "was not sustained by the evidence, and the vocational expert's testimony in response to the question was without support in the record"); *Walker v. Bowen,* 889 F.2d 47, 50 (4th Cir.1989) (vocational expert testimony must be based on a proper hypothetical containing limitations based on the evidence of record to be reliable). The ALJ's hypothetical question to the VE mirrored the limitations found by the ALJ in his RFC findings. Because the Court has determined the ALJ's RFC findings are supported by substantial evidence, the Court declines to find error in the hypothetical to the vocational expert based on these same findings.

> or her capacity to do work-related physical and mental activities. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule. . . .

SSR 96-8p, 61 Fed. Reg. 34,474–01, at 34,475 (July 2, 1996) (internal citation and footnotes omitted).  The RFC assessment must first identify the Plaintiff's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945.  *See id.*  Only after this identification and assessment may RFC be expressed in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy.  *Id.*

In assessing RFC, the ALJ must consider limitations and restrictions imposed by all of a claimant's impairments, including those that are not severe.  *Id.* at 34,477.  While a non-severe impairment standing alone may not significantly limit a claimant's ability to do basic work activities, it may be crucial to the outcome of a claim when considered in combination with limitations or restrictions due to other impairments.  *Id.*  If the ALJ finds a combination of impairments to be severe, "the combined impact of the impairments shall be considered throughout the disability determination process." 42 U.S.C. §§ 423(d)(2)(B), 1382c(a)(3)(G).

Additionally, the Administration has determined that in assessing RFC, the ALJ

> must consider only limitations and restrictions attributable to medically determinable impairments.  It is incorrect to find that [a claimant] has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related

31

> symptoms, such as pain, due to factors such as age or height, or whether the [claimant] had ever engaged in certain activities in his or her past relevant work (e.g., lifting heavy weights.) Age and body habitus (i.e., natural body build, physique, constitution, size, and weight, insofar as they are unrelated to the [claimant]'s medically determinable impairment(s) and related symptoms) are not factors in assessing RFC . . . .

SSR 96-8p, 61 Fed. Reg. at 34,476. To assess a claimant's RFC, the ALJ must consider all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements. *Id.* at 34,477. SSR 96-8p specifically states, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." *Id.* at 34,478.

Likewise, in considering Plaintiff's testimony regarding her limitations, the ALJ must consider all relevant evidence of record. See, SSR 96-7p, 61 Fed. Reg. at 34,485(whenever a claimant's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record.) The credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.*; *see also Hammond*, 765 F.2d at 426 (stating that the ALJ's credibility determination "must refer specifically to the evidence informing the ALJ's conclusions").

The following is a nonexhaustive list of relevant factors the ALJ should consider in evaluating a claimant's symptoms, including pain: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms; (5) treatment, other than medication, received to relieve the symptoms; and (6) any measures the claimant has used to relieve the symptoms.  20 C.F.R. § 1529(c)(3).  If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination. *Mastro*, 270 F.3d at 176 (holding that the court is not to "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of" the agency).

**Discussion**

In this case,  the ALJ accepted that Plaintiff's impairments could reasonably have been expected to cause some of her alleged symptoms, but found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not fully credible.  [R. 16.]  The ALJ explained the basis for his determination as follows:

> At the hearing, the claimant testified that prior to her date last insured, she had to stop working due to health and pregnancy complications. She indicated that she drove and had a valid driver's license. She stated that she did not need an assistive device for ambulation. The claimant reported that she had falling spells, her left side became numb, and she had headaches. The claimant also stated that she had a rectal hernia that was very painful. She also indicated that she could not remember all that she could and could not do during that time since she had subsequently underwent brain surgery. She indicated that because she did not work at the time, her doctors restricted her to resting. The claimant testified that her mother and husband helped her with the children and that she did some light cleaning and meal

33

preparation. The claimant further stated that she could lift her 7-pound baby, but not her older children, at that time. She also indicated that she could sit for 10-15 minutes and often had to lie down due to hernia.  After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment set forth below. Specifically, the undersigned questions the claimant's inability to recall her limitations prior to her date last insured due to her alleged memory problems. In addition, the undersigned notes that the claimant had a full-term pregnancy during this time. Although the claimant indicated that she received help from her mother and husband in caring for her children, the claimant's records with Dr. Richardson from November of 2004 reveal that she was very busy staying at home caring for her two youngest children, each under the age of 6. As a result, the undersigned finds that despite her impairments the claimant was capable of engaging in a variety of exertional activities and gives her testimony regarding her limitations limited weight.

The undersigned finds that the claimant's degenerative disk of the lumbar spine was consistent with her ability to perform a full range of unskilled sedentary work through her date last insured.  The claimant testified that she could not lift more than her 7-pound child and that she could sit for only short periods of time due to pain. The undersigned questions the claimant's testimony in light of her limited medical treatment for back pain, consisting of a few visits to her internist, Paul Richardson, M.D., in May and June of 2006. An MRI scan revealed arthritis, which did not require surgery, the use of injections, or narcotic pain medications.  In addition, the claimant's physical exams were unremarkable, with 5/5 muscle strength in all extremities, and her lab work was normal. (Exhibits 5F; 12F). Moreover, the claimant admitted that she was capable of caring for 3 young children, driving, and performing some household chores, which is given significant weight. As a result, the undersigned finds that prior to her date last insured, the claimant's degenerative disk disease of the lumbar spine resulted in her inability to lift heavy items, but was consistent with her ability to perform a full range of unskilled sedentary work.

The undersigned further finds that the claimant's solitary rectal ulcer syndrome was consistent with her ability to perform a full range of unskilled sedentary work through her date last insured.  Treatment notes reveal that in April 2004, Dr. Richardson referred the claimant to Richard Eisenman, M.D., a gastroenterologist, due to intermittent constipation, diarrhea, bloating, and rectal bleeding. Upon examination, the claimant, who was tanned, had a non-tender abdomen with no evidence of masses, bruits, or

organomegaly, as well as no visible hemorrhoids or anal fissures. The claimant underwent a colonoscopy that was unremarkable, aside from erythema, ulceration, and fibrosis of the rectum. The claimant's biopsies were also negative. Dr. Eisenman diagnosed the claimant with solitary rectal ulcer syndrome, with no evidence of irritable bowel syndrome, and prescribed Canasa suppositories and stool softeners for her, which decreased her pain and bleeding. The claimant did not return to Dr. Eisenman until November of 2006, after the date last insured. (Exhibit l2F). As a result, the undersigned finds that while the claimant's solitary rectal ulcer syndrome resulted in her inability to perform heavy lifting, it was consistent with her ability to perform a full range of unskilled sedentary work through her date last insured.

Finally, the undersigned also finds that through the date last insured, the claimant's anxiety was consistent with her ability to perform unskilled (sedentary) work. Pursuant to Social Security Ruling 96-9P, the undersigned has considered the claimant's ability to perform several basic work-related activities on a sustained basis (i.e., 8 hours a day, 5 days a week, or an equivalent work schedule). The following mental activities are generally required by competitive, remunerative, unskilled work: understanding, remembering, and carrying out simple instructions; making judgments that are commensurate with the functions of unskilled work--i.e., simple work-related decisions; responding appropriately to supervision, co- workers and usual work situations; and dealing with changes in a routine work setting. A less than substantial loss of ability to perform any of the above basic work activities mayor may not significantly erode the unskilled sedentary occupational base. The individual's remaining capacities must be assessed and a judgment made as to their effects on the unskilled occupational base considering the other vocational factors of age, education, and work experience.

After thoroughly reviewing the evidence of record, the undersigned finds no limitations in the claimant's ability to perform these basic work related activities on a sustained basis through her date last insured. Treatment notes reveal that Dr. Richardson, the claimant's internist, prescribed Paxil for her in September of 2003, due to anxiety-related chest pain. In October of 2003, the claimant reported that she had skipped her prescribed stress test, due to significant improvement in her symptoms with Paxil. Dr. Richardson also discussed coping strategies with the claimant, the mother of 3 young children. By March of 2004, the claimant reported that she was better overall with only occasional break-through anxiety. In May of 2004, the claimant reported that the prescribed Paxil really helped her symptoms. In August of 2004, the doctor prescribed Xanax for the claimant's acute episode of insomnia. In November of 2004, the claimant reported that she had a busy life with her children, leading Dr. Richardson to categorize her anxiety as "situational" and change her medication to Wellbutrin. The

claimant only sought treatment with Dr. Richardson on one occasion in June of 2006 for sinus-related vertigo, and did not seek treatment for anxiety again until May of 2006, at which time he prescribed Lexapro for her. (Exhibit 5F). Dr. Richardson never referred the claimant to a psychiatrist or counselor or gave her any limitations prior to her date last insured. As a result, the undersigned finds that prior to the date last insured, the claimant retained the ability to perform all of the mental activities generally required by competitive, remunerative, unskilled work. The claimant retained the ability to understand, remember, and carry out simple instructions and to make simple work related decisions, as demonstrated by her ability to cook, drive, perform simple household chores, and care for her 3 children. In addition, the claimant's treatment records failed to demonstrate that her ability to respond appropriately to supervision, co- workers and usual work situations or to deal with changes in a routine work setting were compromised by her impairment. As a result, the undersigned finds that the claimant retained the ability to perform unskilled (sedentary) work through her date last insured.

As for the opinion evidence, the undersigned notes that although the record contains treating physician statements from 2010, there are no opinions prior to the date last insured. The undersigned notes that the state agency found insufficient evidence prior to the date last insured to make a determination regarding the claimant's residual functional capacity.

[R. 16-18.]

Upon review, the Court finds the ALJ conducted a proper analysis in determining the credibility of Plaintiff's subjective complaints by fully explaining his decision and citing relevant evidence. Additionally, the ALJ explained his evaluation of Plaintiff's RFC and his consideration of all relevant evidence in the record, including medical history, medical signs, laboratory findings, lay evidence, and medical source statements. While Plaintiff argues the Commissioner failed to provide evidence to support its RFC finding, it is the a Plaintiff's burden to establish disability in Steps 1 through 4 of the sequential evaluation, *Grant*, 699 F.2d at 191; thus, Plaintiff bore the burden of establishing her inability to perform work-related activities. Plaintiff, however, has failed to direct the Court to any evidence prior to the date last insured that would support greater limitations than those

assessed by the ALJ.   *See Craig*, 76 F.3d at 589 (stating that, where conflicting evidence

"allows reasonable minds to differ as to whether a claimant is disabled, the responsibility

for that decision falls on the [Commissioner](or the [Commissioner's] designate, the ALJ),"

not on the reviewing court; the court may not "undertake to re-weigh conflicting evidence,

make credibility determinations, or substitute [its] judgment for that of the [Commissioner]");

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (holding that it is the Commissioner's

responsibility, not the court's, to determine the weight of evidence and resolve conflicts of

evidence); *Laws*, 368 F.2d at 642 (holding it is not within the province of a reviewing court

to determine the weight of the evidence, nor is it the court's function to substitute its

judgment for that of the Commissioner, so long as the decision is supported by substantial

evidence); *Snyder*, 307 F.2d at 520 (same).  Thus, without a showing by Plaintiff that the

Commissioner's decision is not supported by substantial evidence, the Court is bound to

uphold the decision.

**New Evidence**

Finally, Plaintiff contends the ALJ erred in failing to consider two pieces of new

evidence–a note dated February 3, 2011 from Carol Ann Gardner, CFNP and a re-

evaluation note from Dr. Richardson (the "new evidence").  [Doc. 14 at 4, 14.] Plaintiff

contends the ALJ and Appeals Council erred in failing to grant either reversal or remand

based on the new and material evidence which was received by the ALJ prior to the date

of the decision and that the ALJ failed to make the evidence a part of the record.   [*Id*.]

While the referenced new evidence is not a part of the record for review by the

Court, and was not provided to the Court by Plaintiff, the Plaintiff represents that the new

evidence was submitted to the ALJ on February 11, 2011, three (3) days after the hearing

and fourteen (14) days prior to the date of his decision, [Doc. 14 at 4, fn 1]; and that the

evidence "tends to support the limitations and restrictions placed on the Claimant as a

result of her rectal prolapse and chronic pain issues which have consistently plagued the

Claimant since her onset" [*Id*. at 14]. Specifically, Plaintiff contends

> [the] medical questionnaire provided to the ALJ post-hearing from the
> claimant's long-term family practitioner, Carol Ann Gardner, FNP, stated that
> "pt. cannot stand or walk in constant duration longer than 15-20 minutes" and
> that claimant is unable to work "due to joint pain, extremity numbness,
> emotional and cognitive factors, "must take freq. rest times – due to physical
> limitations, ext. must be elevated . . . during episodes of numbness," and that
> "In my opinion, Ms. Rutherford is unable due to multiple health reasons to
> have gainful employment – she is totally and permanently disabled" (no
> exhibit).

[*Id.* at 12.]

**Discussion**

In the Fourth Circuit, a reviewing court must include new evidence reviewed by the

Appeals Council in its consideration of the record as a whole in determining whether

substantial evidence supports the ALJ's decision:

> The Appeals Council must consider evidence submitted
> with the request for review in deciding whether to grant review
> "if the additional evidence is (a) new, (b) material, and (c)
> relates to the period on or before the date of the ALJ's
> decision." Evidence is new within the meaning of this section
> if it is not duplicative or cumulative. Evidence is material if
> there is a reasonable possibility that the new evidence would
> have changed the outcome.

*Wilkins v. Sec'y, Dep't of Health & Human Servs.*, 953 F.2d 93, 95–96 (4th Cir. 1991)

(citations and footnote omitted). Although the new evidence must relate to the period on

or before the date of the ALJ's decision, "[t]his does not mean that the evidence had to

have existed during that period.   Rather, evidence must be considered if it has any bearing upon whether the Claimant was disabled during the relevant period of time." *Reichard v. Barnhart*, 285 F. Supp. 2d 728, 733 (S.D.W. Va. 2003) (quoting 20 C.F.R. § 404.970(b)).

The Appeals Council, upon denying review of Plaintiff's claim, stated with regard to the new evidence that

> We also looked at a Medical Questionnaire and Reevaluation Note from treating physician   Paul M. Richardson, Jr., M.D. and Carol Ann Gardner, CFNP dated February 3, 2011. The Administrative Law Judge decided your case through September 30, 2006, the date you were last insured for disability benefits. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled at the time you were last insured for disability benefits.

[R. 2.]

**Analysis**

Upon review, the Court finds no basis for concluding that the new evidence has any bearing on whether the Plaintiff was disabled during the relevant period of time.  To the contrary, the Court notes there is no discussion by Plaintiff regarding whether the physician's opinion dated February 2011 addressed the opinion's relationship back to the relevant time period, between January 1, 2002, and September 30, 2006; or whether the opinion found that Plaintiff was disabled as of a date within the relevant time period.  The absence of evidence relating this opinion back to the relevant time period–over four years after the expiration of the date last insured–is fatal to Plaintiff's argument. *See Johnson v. Barnhart*, 434 F.3d 650, 655–656 (4th Cir.2005)(holding that the opinion of a treating physician rendered nine months after the claimant's date last insured was irrelevant). Further, as previously stated, the conclusory statement that Plaintiff is "totally and

permanently disabled" is not a basis for remand as that is not a decision to be made by a medical provider.    *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d at 1029.

## CONCLUSION AND RECOMMENDATION

Wherefore, based on the foregoing, it is recommended that the decision of the Commissioner be affirmed.

IT IS SO RECOMMENDED.

s/Jacquelyn D. Austin
United States Magistrate Judge

February 7,  2014
Greenville, South Carolina